SHARTSIS FRIESE LLP
JOEL ZELDIN (Bar #51874)
FRANK A. CIALONE (Bar #172816)
SANJEET S. GANJAM (Bar #285615)
One Maritime Plaza, Eighteenth Floor
San Francisco, CA 94111-3598
Telephone: (415) 421-6500
Facsimile: (415) 421-2922

Attorneys for Plaintiff LTC (BVI) LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND COURTHOUSE

| | |
|---|---|
| LTC (BVI) LIMITED, a British Virgin Islands limited company,<br><br>Plaintiff,<br><br>v.<br><br>BRAUNHAGEY & BORDEN LLP, a limited liability partnership, and DOES 1 through 20,<br><br>Defendants. | Case No. 4:22-cv-03481-YGR<br><br>**DECLARATION OF SANJEET S. GANJAM IN SUPPORT OF PLAINTIFF LTC (BVI) LIMITED'S MOTION FOR ATTORNEYS' FEES**<br><br>Date: February 27, 2024<br>Time: 2:00 PM<br>Courtroom: 1<br>Judge: Hon. Yvonne G. Rogers |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

I, SANJEET S. GANJAM, declare as follows:

1. I am an attorney at law licensed to practice before this Court and all courts of the State of California. I am a Partner with the law firm of Shartsis Friese LLP, counsel of record for Plaintiff LTC (BVI) Limited ("LTC"). I submit this declaration in support of LTC's Motion for Attorneys' Fees (the "Motion"). I have personal knowledge of the facts set forth herein and, if called to testify, can and will testify competently thereto.

**Meet And confer re removal and remand**

2. On April 21, 2022, my office provided a copy of the Complaint in this action to Defendant BraunHagey & Borden LLP ("BHB") in an attempt to resolve the dispute before filing suit. Those efforts were unsuccessful, so on May 4, 2022, LTC filed the Complaint in the Superior Court of California, County of San Francisco, the court in which BHB is subject to general jurisdiction.

3. BHB did not meet and confer with or provide any notice to LTC before seeking removal on June 13, 2022, which it accompanied with a Motion for Judgment on the Pleadings. BHB's attempt to remove was based on its reading of the forum selection clause in a Stock Purchase Agreement between LTC and a third party named Outdoorsy (the "SPA"). BHB was not and is not a party to the SPA. On July 1, 2022, LTC wrote to BHB requesting that BHB stipulate to remand on the basis of the forum defendant rule and the plain meaning of Section 6.15 of the SPA, which allows for suits to be filed in <u>either</u> state court <u>or</u> federal court, setting aside whether that provision even applies to the parties' current dispute. Attached hereto as **Exhibit A** is a true and correct copy of the July 1, 2022 meet and confer letter from counsel for Plaintiff LTC to Defendant BHB.

4. In that letter, I previewed to BHB all of the reasons removal was defective and identified relevant authority. I emphasized that BHB's removal was not objectively reasonable under the circumstances and, if BHB declined to stipulate to remand, that LTC intended to seek attorneys' fees as allowed by the statute for bad faith removal (28 USC §1447(c)) incurred to obtain a remand.

5. BHB responded on July 7, 2022, curtly declining to stipulate to remand, without any acknowledgement of the forum defendant rule or any explanation or argument as to why the Court

should disregard the plain meaning of Section 6.15. BHB dismissively responded by stating that "the core fact set forth in BHB's removal papers: namely, that LTC expressly waived its right to contest the federal forum in the SPA." Attached hereto as **Exhibit B** is a true and correct copy of the July 7, 2022 email from Defendant BHB to Plaintiff LTC.

6. BHB also declined to delay the hearing and briefing on its motion for judgment on the pleadings, notwithstanding that the common practice in the Northern District of California is to first decide motions to remand before deciding other substantive motions. LTC asked BHB to stipulate to a reasonable briefing schedule whereby the parties could delay briefing on BHB's premature motion for judgment on the pleadings until after the court decided whether removal was proper in the first instance. BHB refused, stating:

> As for your request to indefinitely continue briefing on Defendant's motion for judgment on the pleadings, BHB respectfully declines. That motion should dispose of this action, and we are not willing to indefinitely delay it based upon an unfiled motion for remand that LTC has waived the right to bring, and which appears to have little, if any, prospects of success.

Ex. B at 1.

7. On LTC's administrative motion, this Court vacated the hearing on BHB's motion for judgment on the pleadings. ECF Dkt No. 19. In doing so, this Court chastised BHB for its "improper gamesmanship" in the process: "[t]o the extent defendant did refuse to stipulate to a continuance [of the motion for judgment on the pleadings] pending resolution of jurisdictional issues, **such refusal is not well taken**." ECF Dkt No. 19 at 1 (emphasis added). BHB's gamesmanship caused LTC to incur avoidable attorneys' fees for filing an administrative motion to vacate the hearing on the motion for judgment on the pleadings, as well as drafting an opposition to that motion in the event the this Court did not agree to continue the hearing.

8. On August 15, 2022, this Court remanded the case to San Francisco Superior Court. In denying LTC's request that BHB be sanctioned for improperly removing the case—the defendant is a California citizen being sued under California law for negligence taking place in California—this Court of the Northern District of California ("District Court") admonished BHB: "defense counsel is **forewarned. The motion could have resulted in the award of attorneys' fees**. The Court will be mindful of any further motions to remand by defense counsel in the future."

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

ECF Dkt. No. 26 (Remand Order) at 4 (emphasis added).

**BHB's efforts to delay the appeal**

9. Unhappy with the ruling of the District Court, a day after the remand order was issued, BHB filed a Notice of Appeal of the Remand Order to the Ninth Circuit Court of Appeals ("Ninth Circuit"). ECF Dkt. No. 28. The briefing took several months, and BHB requested extensions at least three times to file briefs. *E.g.*, 9th Cir. ECF Dkt. Nos. 7 (for opening brief), 19 (for reply brief), 40 (for opposition to Motion to Transfer). BHB recycled the same arguments it had made unsuccessfully to the District Court, falsely arguing that the language of the SPA (to which it was not even a party) supported some sort of waiver, when it indisputably did not. *See* 9th Cir. ECF Dkt. No. 11. Oral arguments did not take place until July 12, 2023, again because BHB claimed it had scheduling conflicts on earlier hearing dates that were available. 9th Cir. ECF Dkt. No. 28.

**BHB's efforts to obtain a stay of the Superior Court proceedings**

10. Soon after filing its appeal to the Ninth Circuit, and upon receiving basic discovery requests from LTC for documents that BHB would have had to produce whether the case proceeded in the San Francisco Superior Court or in this District Court, BHB moved to stay this action in the Superior Court. On October 28, 2022, the Superior Court granted the stay. LTC's subsequent motion to vacate the stay order -- after the Ninth Circuit affirmed that the case must be remanded -- was denied by the Superior Court Law and Motion Judge for the stated reason that the fee application before this Court was still pending.

**The Ninth Circuit's decision in favor of LTC**

11. On July 27 2023, the Ninth Circuit issued a short memorandum dismissing the appeal on the grounds that it had no jurisdiction to hear the appeal. During oral arguments, both sides argued that the Ninth Circuit might have jurisdiction to review a remand order if it contradicted a contractual waiver of the forum-defendant rule. Implicit in the Ninth Circuit's decision, therefore, is a finding that there was no contractual waiver of the forum-defendant rule, as BHB had argued. After the remand was affirmed on appeal, LTC had asked BHB to stipulate that determination of prevailing party attorneys' fees be deferred until the resolution of the state

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

action, with all rights reserved by both sides, but BHB refused to so stipulate. LTC, thereafter, filed its Motion to Transfer Consideration of Attorneys' Fees, or in the alternative, Request for Attorneys' Fees filed before the Ninth Circuit (the "Motion to Transfer").

**Attorneys' fees incurred in the District Court and the Ninth Circuit**

12. LTC is entitled to contractual attorneys' fees because BHB unsuccessfully invoked rights under the SPA to which LTC is a party. A true and correct copy of that SPA (without its voluminous exhibits) is attached hereto as **Exhibit C.** Section 6.8 of the SPA provides that the prevailing party in a dispute under the SPA is entitled to recover its attorneys' fees:

> 6.8 Expenses. . . . If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, . . . the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

Ex. C (SPA), p. 17.

13. LTC has incurred attorneys' fees of at least $58,577.50 in this District for obtaining a remand, at least $76,180.50 for the Ninth Circuit appeal, and at least $16,871.00 to bring this Motion before this Court. In total, LTC seeks an award of attorneys' fees for the sum total of $151,629.00 pursuant to the Motion, plus any additional fees incurred in preparing the Reply papers and preparing for and attending any hearings on this Motion. (As part of LTC's Motion to Transfer, LTC originally requested $119,175.50. That amount did not include some time incurred on the date of the filing that had not yet been recorded at the time of the filings, and time incurred since the Ninth Circuit's order on the Motion to Transfer, including the time spent drafting and filing this Motion.)

14. Attached hereto as **Exhibit D** is a true and correct copy of billing statements from Shartsis Friese LLP ("SF") reflecting the attorneys' fees incurred LTC from June 13, 2022 to December 31, 2023 (the "Billing Statements"). LTC and its counsel do not intend to waive the attorney-client privilege, work product protection or any other right or privilege by submitting these Billing Statements.

15. For the instant Motion, LTC incurred additional fees totaling $16,871.00. This was comprised of 17 hours of my time at an hourly rate of $735.00, 3.10 hours of Joel Zeldin's time at

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

an hourly rate of $960, and 3.5 hours of paralegal Chris Berggren's time at an hourly rate of $400, for an additional $16,871.00.

**<u>Shartsis Friese LLP's Billing Rates and Staffing</u>**

16. SF staffed this matter efficiently. Below is a chart showing the amount of fees, attributable to each timekeeper, for all of the attorneys' fees sought in the instant motion. The table below shows the time spent by each timekeeper and the fees incurred by LTC:

| Timekeeper | Dist. Ct. Removal/ Remand Hours | Dist. Ct. Removal/ Remand Fees | 9th Cir./Court of Appeal Hours | 9th Cir./Court of Appeal Fees | Fee Motion Hours | Fee Motion Fees | Total Hours | Total Fees |
|---|---|---|---|---|---|---|---|---|
| Joel Zeldin | 4.00 | $3,560.00 | 28.60 | $27,001.00 | 3.10 | $2,976.00 | 35.70 | $33,537.00 |
| Frank Cialone | 3.10 | $2,480.00 | 4.80 | $4,132.50 | 0.00 | $0.00 | 7.90 | $6,612.50 |
| Sanjeet Ganjam | 75.50 | $50,962.50 | 59.00 | $42,243.00 | 17.00 | $12,495.00 | 151.50 | $105,700.50 |
| Chris Berggren | 0.00 | $0.00 | 7.10 | $2,729.00 | 3.50 | $1,400.00 | 10.60 | $4,129.00 |
| Amanda Hudson | 4.20 | $1,575.00 | 0.20 | $75.00 | 0.00 | $0.00 | 4.40 | $1,650.00 |
| **TOTALS** | **86.80** | **$58,577.50** | **99.70** | **$76,180.50** | **23.60** | **$16,871.00** | **210.10** | **$151,629.00** |

17. I am a Partner at SF and have been practicing law for over 11 years. I specialize in commercial contract disputes and business torts such as this case. I have represented numerous clients in such cases. I was responsible for the motion practice, appellate briefing and argument in this case. I attended and argued the appeal brought by BHB, in which LTC prevailed.

18. Mr. Zeldin has been practicing law for over 52 years. He is a former law clerk to Chief Justice Donald R. Wright of the California Supreme Court, has been listed as a Superlawyer for many years, and listed as a Best Lawyer in America in the categories of Commercial Litigation, Bet-the-Company cases, and Real Estate for many years. In 2013, American Lawyer Media selected him as a 2013 Top Rated Lawyer in Real Estate. In 2017, Superlawyers listed him as a Top 100 Lawyer in Northern California. He handles a broad variety of business disputes, and his practice focuses on representing or opposing lawyers in all professional and business contexts, as well as on real estate and on disputes involving entity governance and control. Mr. Zeldin has also given presentations and lectures on the subject of federal jurisdiction and on legal ethics and the standard of care for lawyers.

19. Mr. Cialone has been practicing law since 1994 (more than 28 years), and has been a partner at Shartsis Friese LLP since January 2002. Mr. Cialone represents clients in a variety of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

business disputes. Mr. Cialone also represents lawyers and has given presentations and lectures on the subject of legal ethics. Mr. Cialone has been listed as a Superlawyer every year since 2009.

20. I accounted for 70% of the total fees. Both Mr. Zeldin and Mr. Cialone have provided oversight and strategic advice throughout this matter, including reviewing and commenting on motions and pleadings, and preparation for oral argument.

21. Mr. Berggren is the main paralegal on this matter and has been a paralegal for over 10 years. He was responsible for cite-checking and preparing briefs for filing, as well as binders for oral arguments. Ms. Hudson, who accounted for less than 1% of the total fees, is another experienced paralegal who assisted early on in this matter when Mr. Berggren was not available.

22. At the outset of SF's representation, my hourly rate was $675, Mr. Zeldin's hourly rate was $890, Mr. Cialone's hourly rate was $800, Mr. Berggren's was $370, and Ms. Hudson's was $375. These rates increased annually as part of regularly scheduled market rate increases. In January of 2023, my hourly rate increased to $735, when I became a Partner. In March of 2023, Mr. Zeldin's hourly rate increased to $960, Mr. Cialone's hourly rate increased to $875, and Mr. Berggren's hourly rate increased to $400.

23. Shartsis Friese LLP regularly compares its billing rates to those of similar law firms doing similar work, and through those efforts has determined that our rates for attorneys and other timekeepers are reasonable. (This is discussed in more detail in the Declaration of James Schwarz in support of this Motion, filed concurrently herewith.)

**<u>The attorneys' fees incurred by LTC are reasonable</u>**

24. As discussed above, the basis of BHB's initial removal was not even colorable. BHB inappropriately invoked a forum-selection clause in the SPA, to which BHB was not a party or third party beneficiary, and, crucially, one that makes no reference to exclusive federal jurisdiction. (Ex. C § 6.15). Rather, the contract entitled the parties to sue in the state courts of California "or" the U.S. District Court of the Northern District of California. *Id*. This is what the district court found when it remanded the case. The explicit permissiveness of the clause, allowing a party to sue in state court, is the stated reason that the District Court indicated that it seriously considered sanctioning BHB.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

25. Despite this rebuke, BHB insisted on a meritless appeal based on those same arguments. BHB's appeal was tactical, intended to delay the prosecution of this case and cause LTC to incur substantial attorneys' fees. The District Court should not reward such improper gamesmanship and should instead award the full amount incurred by LTC, the prevailing party, as reasonable attorneys' fees under the SPA and California Civil Code section 1717.

26. In opposition to the Motion to Transfer, BHB argued that any billing entry which contains a redaction should be disregarded in its entirety. LTC has partially redacted some entries (less than 40% of entries) to avoid disclosing attorney-client privileged communications and to preserve work product protections, but the redactions have been done in a manner that demonstrates what work was performed and describes the time spent without disclosing the contents of a privileged communication. For example, the following entry shows time incurred on a strategy conference without revealing the contents of the conference:

| | | | |
|---|---|---|---|
| 8/18/22 | SSG | Confer with F. Cialone regarding strategy for [redacted] | .20 |

Ex. D, p. 8. The entry adequately describes the services provided (a 12 minute strategy discussion between two attorneys). Such redactions are necessary to preserve privilege and are consistent with Civil L. R. 54-5(b), which does not even require that the moving party produce invoices with time entries in the first instance, and general custom and practice on a fee application. If requested by the Court, LTC will produce unredacted invoices for an *in camera* review.

27. BHB also argued, in opposition to the Motion to Transfer, that the Court should discount certain unidentified entries containing "block billing." The majority of entries do not reflect any block billing. Where entries arguably contain block billing, it is readily discernible from the context what work was done. For example, the following entry may have tasks punctuated by a semicolon, but the narrative makes it clear that both the research and the drafting related to the same brief, and it is not generally practical to allocate time as between research and drafting:

| | | | |
|---|---|---|---|
| 6/23/22 | SSG | Draft opposition to motion to remand; research and analysis regarding same | 1.20 |

Ex. D, p. 2. Indeed, the entry would have been sufficiently accurate had it just read "draft opposition" without more.

28. Similarly, in other entries, the context makes it clear that one task is incidental to





SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

the main task. For example, the below example included an internal conference among the case team to discuss revisions relating to the meet and confer letter:

| | | | |
|---|---|---|---|
| 7/01/22 | SSG | Revise and send meet and confer letter regarding remand and motion for judgment on the pleading; confer with F. Cialone and J. Zeldin regarding same | 2.80 |

Ex. D, p. 5. The amount of conference time is readily discernible from reviewing the corresponding entries by Mr. Cialone and Zeldin, who spent 0.2 and 0.4 hours respectively. The ability to corroborate such entries eliminates any doubt as to the accuracy of the time entries. Given that few entries contain any sort of block billing, and in each of those instances it is readily discernible what work was done, no reduction is appropriate.

**Meet and confer regarding this Motion**

29. Counsel for LTC met and conferred with counsel for BHB for the purpose of attempting to resolve the disputed issues relating to this Motion, but they were unable to reach a resolution.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This Declaration was executed on January 10, 2024 in San Francisco, California.

SANJEET S. GANJAM

10227776

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

# Exhibit A

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598

**Sanjeet S. Ganjam**
sganjam@sflaw.com
415-773-7275

July 1, 2022

***VIA EMAIL***

Ronald J. Fisher
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104

Re: *LTC (BVI) Limited v. BraunHagey & Borden LLP*
San Francisco Superior Court, Case No. CGC-22-599497
US. District Court for the Northern District of California, Case No. 4:22-cv-03481-YGR

Dear Mr. Fisher:

I write on behalf of Plaintiff LTC (BVI) Limited ("LTC") to meet and confer with you regarding Defendant BraunHagey & Borden LLP's ("BraunHagey") improper removal of the above-captioned action to the Northern District of California. Under the forum-defendant rule, removal by defendant based solely on diversity jurisdiction is not permitted when defendant is a citizen of the state in which the action was filed. 28 U.S.C. § 1441(b)(2). This action was brought in the Superior Court of California, the state in which BraunHagey is a citizen and where it is subject to general jurisdiction. Unless BraunHagey stipulates to remand this action back to state court, LTC will move to remand and seek cost-shifting sanctions for improper removal.

Additionally, the District Court cannot decide BraunHagey's Motion for Judgment on the Pleadings ("MJOP") without first finding that removal was proper. If instead the District Court finds that removal was improper, it will not have jurisdiction to and cannot decide the MJOP. Accordingly, we ask that you stipulate to continue the hearing and postpone briefing on the MJOP until after the Court decides LTC's expected Motion to Remand.

**BraunHagey's Improper Removal**

The removal of this action is prohibited under 28 U.S.C. § 1441(b)(2), which provides "a civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties . . . is a citizen of the State in which such action is brought." *Id* (Emphasis added). This action was filed in California, where BraunHagey is a citizen. ECF Dkt. No. 1 (Notice of Removal) ¶ 11; 1-2 (BraunHagey's Answer) ¶ 2.

BraunHagey argues in its Notice of Removal that removal is proper because there is complete diversity between the parties, but that argument misses the point. ECF Dkt. No. 1 (Notice of Removal) ¶¶ 10-13. The issue is not whether the parties are diverse or whether LTC could have brought this action in federal court, but rather whether BraunHagey has a right to remove to federal court, which it does not.

BraunHagey's other argument -- that the Stock Purchase Agreement between LTC and nonparty Outdoorsy, Inc. ("SPA") requires any disputes between the parties arising out of or based upon the SPA to be brought in federal court -- is equally meritless. As a threshold matter, it is black letter law that parties cannot consent to or confer federal jurisdiction by agreement. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982); *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373 (9th Cir. 1997). Federal jurisdiction either exists or does not exist. In this case it does not for the reasons discussed above.

Even if the Court were to decide that this action falls within the scope of the SPA's dispute resolution clause, BraunHagey's argument is *non sequitur*. Section 6.15 on its face does not require any claims to be brought in federal court:

> 6.15 Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of California **and** to the jurisdiction of the United States District Court for the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of California **or** the United States District Court for the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the foregoing courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

Section 6.15 is a standard forum selection and venue clause requiring claims to be filed in California, either in state court or in the Northern District of California. It does not confer federal subject matter jurisdiction by agreement. The parties are permitted to file a claim in either state or federal court in California. Assuming both courts have jurisdiction, plaintiff has the choice. It make sense that Section 6.15 would preserve both options because, as discussed above, an agreement cannot confer federal subject-matter jurisdiction.

Moreover, this action involves a negligence claim against BraunHagey, who is not a party to the SPA. BraunHagey's failure to exercise reasonable care to safeguard its confidential communications with LTC resulted in perpetrators stealing $2.8 million dollars from LTC. That claim has nothing to do with the transaction contemplated by the SPA other

than that the funds were being sent to Outdoorsy, Inc. The adjudication of the negligence claim does not require the interpretation of any provision in the SPA or implicate any duty owed by Outdoorsy, Inc. By your logic, if LTC had sued BraunHagey for a "slip and fall" at BraunHagey's office, that claim too would be governed by the SPA.

The cases you purport to rely on for the proposition that a nonparty can enforce a dispute resolution clause in a contract do not support your argument. Those cases all involve a nonparty who was a successor-in-interest to one of the contracting parties, a parent or subsidiary to the contracting party, a third party beneficiary of the contract, or an agent accused with interfering with the contract. None of those cases concern an independent negligence claim against a nonparty.

Please also take notice that if you will not stipulate to have this action remanded to state court and we have to file a Motion to Remand, we will seek cost-shifting sanctions under 28 U.S.C. § 1447(c) in the amount of attorneys' fees and costs incurred to file such motion. Cost-shifting sanctions would be justified given the complete lack of legal and factual support for your arguments.

**BraunHagey's Premature Motion for Judgment on the Pleadings**

BraunHagey's Motion for Judgment on the Pleadings ("MJOP") is currently set for hearing before the District Court on August 16, 2022. A hearing on this motion is premature, however, until the Court decides whether BraunHagey's removal was proper. If removal was improper, the District Court lacks jurisdiction to decide the MJOP. Accordingly, it is highly unlikely that the Court would decide the MJOP on August 16, 2022 if there is a pending Motion to Remand.

Please confirm that you will stipulate to continue the hearing and opposition deadline for the MJOP until after the hearing on LTC's Motion to Remand. It would be a waste of the parties' time and resources to brief the MJOP, only to see the case remanded back to state court, where BraunHagey will have to refile its motion.

If you will not agree to postpone the hearing and briefing on your MJOP, we intend to seek appropriate relief from the court, including under the cost shifting provisions of 28 USC 1447(c). We also note that your refusal to stipulate to a sensible sequencing of the motions would violate the Northern District of California Guidelines for Professional Conduct. Those guidelines require counsel to meet and confer in good faith, and agree to reasonable requests for continuances when, as in here, there is no prejudice to the clients and it is likely that the court would grant the continuance. *See* Guidelines for Professional Conduct § 4.

**Response Requested**

Please respond by no later than close of business July 7, 2022, either confirming that you will stipulate to remand this action back to state court or identifying the authority justifying removal. I am also available to meet and confer by telephone or Zoom, with good availability on July 5 - 7, 2022. If we do not hear from you, we will assume that you are not interested in meeting and conferring in good faith to avoid unnecessary motion practice.

Sincerely,

*/s/ Sanjeet S. Ganjam*

Sanjeet S. Ganjam

13085\001\9269020.v2

# Exhibit B

**From:** Ron Fisher <Fisher@braunhagey.com>
**Sent:** Thursday, July 7, 2022 2:10 PM
**To:** Zeldin, Joel <jzeldin@sflaw.com>; Cialone, Frank <FCialone@sflaw.com>; Ganjam, Sanjeet S. <SGanjam@sflaw.com>
**Cc:** Aziz, Lisa P. <LAziz@sflaw.com>
**Subject:** Re: LTC (BVI) Limited v. BraunHagey & Borden LLP

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

Sanjeet,

Thanks for your letter. We think it makes sense to schedule a quick call. I am out of the office Friday and Monday but am available next Tuesday at 10 am or 2 pm.

Some quick notes on your letter. To begin, it does not really address the core fact set forth in BHB's removal papers: namely, that LTC expressly waived its right to contest the federal forum in the SPA. Nor do you explain the grounds for why this case has "nothing to do with the transaction contemplated by the SPA," when the transaction and SPA are repeatedly mentioned in LTC's own complaint. We appreciate your position that BHB's alleged liability does not have anything to do with LTC's investment transaction – which should resolve this case? We look forward to confirming that LTC has waived any claim relating to that event. If you have actual published case authority supporting your position on removal, and that LTC has not waived its right to seek remand, please provide it.

As for your request to indefinitely continue briefing on Defendant's motion for judgment on the pleadings, BHB respectfully declines. That motion should dispose of this action, and we are not willing to indefinitely delay it based upon an unfiled motion for remand that LTC has waived the right to bring, and which appears to have little, if any, prospects of success.

We look forward to answers to our above questions and to conferring with you.

Regards,

Ronald J. Fisher
BRAUNHAGEY & BORDEN LLP
Direct: (415) 429-4539
Cell: (628) 200-1809

**From:** Ron Fisher <Fisher@braunhagey.com>
**Sent:** Wednesday, July 6, 2022 10:20 AM
**To:** Zeldin, Joel <jzeldin@sflaw.com>; Cialone, Frank <FCialone@sflaw.com>; Ganjam, Sanjeet S. <SGanjam@sflaw.com>
**Cc:** Aziz, Lisa P. <LAziz@sflaw.com>
**Subject:** Re: LTC (BVI) Limited v. BraunHagey & Borden LLP

Counsel,

We confirm receipt of your correspondence sent last Friday afternoon just before the 4th of July holiday weekend, and demanding a response within a single business day. We are reviewing and will provide a response late this week or early next week.

Very truly yours,

Ronald J. Fisher
BRAUNHAGEY & BORDEN LLP
Direct: (415) 429-4539
Cell: (628) 200-1809

---

**From:** Aziz, Lisa P. <LAziz@sflaw.com>
**Sent:** Friday, July 1, 2022 1:54 PM
**To:** Ron Fisher <fisher@braunhagey.com>
**Cc:** Zeldin, Joel <jzeldin@sflaw.com>; Cialone, Frank <FCialone@sflaw.com>; Ganjam, Sanjeet S. <SGanjam@sflaw.com>
**Subject:** LTC (BVI) Limited v. BraunHagey & Borden LLP

***** EXTERNAL MESSAGE *****

Dear Mr. Fisher:

Attached please find Mr. Ganjam's letter to you dated July 1, 2022.

Thank you,

Lisa Aziz
Assistant to Sanjeet S. Ganjam
SF Shartsis Friese LLP | [www.sflaw.com]www.sflaw.com | 415-773-7224
One Maritime Plaza, 18th Floor | San Francisco, CA 94111

# Exhibit C

**OUTDOORSY HOLDINGS, INC.**

**SERIES D PREFERRED STOCK PURCHASE AGREEMENT**

**May 25, 2021**

## TABLE OF CONTENTS


**Page**

1. Purchase and Sale of Stock ..... 1
   - 1.1 Sale and Issuance of Series D Preferred Stock ..... 1
   - 1.2 Closing ..... 1
   - 1.3 Subsequent Sale of Series D Preferred Stock ..... 2
   - 1.4 Conversion of Convertible Securities ..... 2
   - 1.5 Acknowledgements Regarding Existing Stock. ..... 3
2. Representations and Warranties of the Company ..... 3
   - 2.1 Organization, Good Standing and Qualification ..... 3
   - 2.2 Capitalization and Voting Rights ..... 4
   - 2.3 Subsidiaries ..... 5
   - 2.4 Authorization ..... 5
   - 2.5 Valid Issuance of Preferred and Common Stock ..... 5
   - 2.6 Governmental Consents ..... 5
   - 2.7 Offering ..... 6
   - 2.8 Litigation ..... 6
   - 2.9 Proprietary Information Agreements ..... 6
   - 2.10 Intellectual Property ..... 6
   - 2.11 Compliance with Other Instruments ..... 7
   - 2.12 Agreements; Action ..... 8
   - 2.13 Financial Statements ..... 8
   - 2.14 Changes ..... 9
   - 2.15 Related-Party Transactions ..... 10
   - 2.16 Permits ..... 10
   - 2.17 Minute Books ..... 10
   - 2.18 Employee Benefit Plans ..... 10
   - 2.19 Tax Returns, Payments and Elections ..... 11
   - 2.20 Insurance ..... 11
   - 2.21 Labor Agreements and Actions; Employee Compensation ..... 11
   - 2.22 Registration Rights ..... 12
   - 2.23 Data Privacy ..... 12
   - 2.24 Disclosure ..... 12
   - 2.25 Foreign Corrupt Practices Act ..... 13
3. Representations and Warranties of the Investors ..... 13
   - 3.1 Authorization ..... 13
   - 3.2 Purchase Entirely for Own Account ..... 13
   - 3.3 Disclosure of Information ..... 13
   - 3.4 Investment Experience ..... 14
   - 3.5 Accredited Investor ..... 14
   - 3.6 Restricted Securities ..... 14
   - 3.7 Legends ..... 14
   - 3.8 Exculpation Among Investors ..... 14

3.9 Further Representations by Foreign Investors ....................14

4. Conditions of Investors' Obligations at Closing ....................15
4.1 Representations and Warranties ....................15
4.2 Performance ....................15
4.3 Compliance Certificate ....................15
4.4 Qualifications ....................15
4.5 Proceedings and Documents ....................15
4.6 Secretary's Certificate ....................15
4.7 Proprietary Information and Employee Stock Purchase Agreements ....................15
4.8 Board of Directors ....................15
4.9 Investors' Rights Agreement ....................15
4.10 Voting Agreement ....................16
4.11 First Refusal and Co-Sale Agreement ....................16

5. Conditions of the Company's Obligations at Closing ....................16
5.1 Representations and Warranties ....................16
5.2 Payment of Purchase Price ....................16
5.3 Qualifications ....................16

6. Miscellaneous ....................16
6.1 Survival of Warranties ....................16
6.2 Successors and Assigns ....................16
6.3 Governing Law ....................16
6.4 Counterparts ....................16
6.5 Titles and Subtitles ....................17
6.6 Notices ....................17
6.7 Finder's Fee ....................17
6.8 Expenses ....................17
6.9 Amendments and Waivers ....................17
6.10 Severability ....................17
6.11 Corporate Securities Law ....................18
6.12 Aggregation of Stock ....................18
6.13 Entire Agreement ....................18
6.14 Waiver of Conflicts ....................18
6.15 Dispute Resolution ....................18

SCHEDULE A Schedule of Investors
SCHEDULE A-1 Exchange; Exchanging Investors

EXHIBIT A Restated Certificate of Incorporation
EXHIBIT B Investors' Rights Agreement
EXHIBIT C Voting Agreement
EXHIBIT D First Refusal and Co-Sale Agreement

**SERIES D PREFERRED STOCK PURCHASE AGREEMENT**

This SERIES D STOCK PURCHASE AGREEMENT (the "Agreement") is made as of the 25th day of May, 2021, by and among **OUTDOORSY HOLDINGS, INC.**, a Delaware corporation (the "Company"), and the investors listed on Schedule A hereto, each of which is herein referred to as an "Investor."

THE PARTIES HEREBY AGREE AS FOLLOWS:

1. Purchase and Sale of Stock.

1.1 Sale and Issuance of Series D Preferred Stock.

(a) The Company shall adopt and file with the Secretary of State of Delaware on or before the Closing (as defined below) the Restated Certificate of Incorporation in the form attached hereto as Exhibit A (the "Restated Certificate").

(b) On or prior to the Closing (as defined below), the Company shall have authorized (i) the sale and issuance to the Investors of shares of its Series D Preferred Stock, Series D-1 Preferred Stock and Series D-2 Preferred Stock (collectively, the "Shares") and (ii) the issuance of the shares of Common Stock to be issued upon conversion of the Shares (the "Conversion Shares"). The Shares and the Conversion Shares shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

(c) Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to:

(i) purchase at the Closing or pursuant to Section 1.3 and the Company agrees to sell and issue to each Investor at the Closing or pursuant to Section 1.3 that number of Shares set forth opposite such Investor's name on Schedule A hereto for the consideration set forth opposite such Investor's name, at a purchase price of $8.1393 for the Series D Preferred Stock, $2.8829 for the Series D-1 Preferred Stock and $7.3254 for the Series D-2 Preferred Stock; and

(ii) in the case of the Investors set forth on Schedule A-1 only (the "Exchanging Investors"), tender to the Company at the Closing, the number of shares of capital stock set forth opposite such Investor's name on Schedule A-1 hereto (the "Existing Stock") in exchange for the issuance and delivery by the Company to such Investor at the Closing, of the number of Shares set forth opposite such Investor's name on Schedule A-1 hereto (the "Exchange").

1.2 Closing. The closing of the purchase and sale of Shares contemplated under Section 1 above shall take place at one or more closings (each, a "Closing"). The initial Closing shall take place at such time and place as the Company and certain Investors acquiring Shares sold pursuant to this Agreement agree upon orally or in writing (which time and place are designated as the "Initial Closing"). At each Closing, the Company shall deliver to each Investor a certificate representing the Shares that such Investor is purchasing against payment of the purchase price therefor by check, wire transfer, cancellation of indebtedness, or any combination

thereof (or, in the case of the Exchange, against tender to the Company of the Existing Stock). In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of such indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

1.3 Subsequent Sale of Series D Preferred Stock. At any time on or before July 1, 2021, the Company may sell up to the number of Shares then authorized in the Restated Certificate not sold at the Initial Closing to such persons as may be approved by the Company. All such purchases of Shares shall be made on the terms and conditions set forth in this Agreement, including, without limitation, satisfaction of the representations and warranties by the Investors as set forth in Section 3. Such purchases of Shares shall be made by each subsequent purchaser by executing counterpart signature pages to this Agreement and the Ancillary Agreements (as defined below), making such purchaser a party and bound by the terms and conditions of this Agreement and the Ancillary Agreements. Any Shares sold pursuant to this Section 1.3 shall be deemed to be "Shares" for all purposes under this Agreement and any purchasers thereof shall be deemed to be "Investors" under this Agreement and each of the Ancillary Agreements. Each sale of additional Shares pursuant to this Section 1.3 shall be deemed a "Subsequent Closing." Schedule A and/or Schedule A-1 to this Agreement, as applicable, shall be updated to reflect the number of Shares purchased at each Subsequent Closing and the parties purchasing such Shares.

1.4 Conversion of Convertible Securities. The Company issued to certain of the Investors simple agreements for future equity (each, a "SAFE" and collectively, the "Convertible Securities") in the aggregate principal amount as set forth opposite such Investor's name on Schedule A.

(a) Each Investor holding Convertible Securities (each, a "Converting Investor", and collectively, the "Converting Investors") agrees to convert its respective Convertible Securities into the number of Shares as set forth across from such Investor's name on Schedule A. Each Converting Investor hereby agrees that upon the conversion of such Convertible Securities, such Converting Investor shall not be entitled to any other consideration in respect of such Convertible Securities other than those Shares set opposite such Investor's name on Schedule A. Each Converting Investor hereby represents and warrants that such Investor has not transferred, pledged or otherwise disposed of, or encumbered any interest in, their Convertible Securities.

(b) Each Converting Investor and the Company hereby agree that as of the Closing all notices required by the terms of, and all rights of such Converting Investors set forth in any SAFE or any other agreement between such Converting Investor and the Company (collectively, the "Converting Holder Rights") shall be terminated and of no further force or effect, and all such Converting Holder Rights are hereby waived by each such Converting Investor in connection with the transactions contemplated hereby.

(c) Notwithstanding the terms of the Convertible Securities, each of the Converting Investors hereby acknowledges and agrees that as of the Closing the aggregate outstanding principal amount of each Convertible Security held by such Converting Investor

shall automatically be converted into Shares in the amount as set forth across from such Investor's name on Schedule A without the requirement of any further action on the part of such Converting Investor.

(d) Upon conversion of the Convertible Securities, the Company shall have no further obligations under the Convertible Securities and the Convertible Securities shall be cancelled. Each Converting Investor hereby waives any right to a fraction of a Share upon conversion of the Converting Investor's Convertible Securities. Each Converting Investor acknowledges and agrees that all instruments documenting the Convertible Securities (collectively, the "Convertible Securities Documents") are null and void effective as of the Closing. In the event of any conflict with the terms and conditions of such documents, the terms and conditions of this Agreement shall supersede such conflicting terms, and for the avoidance of doubt, each Converting Investor hereby agrees that such Convertible Securities Documents are hereby amended to give effect to the foregoing. The Converting Investors shall be treated for all purposes as the record holders of such Shares effective immediately as of Closing.

(e) Other than each Converting Investor's right to receive the Shares set forth opposite such Converting Investor's name on Schedule A and the rights provided for in this Agreement and the Transaction Agreements (as defined below) as a holder of Shares, each Converting Investor hereby waives (on behalf of himself, herself or itself, as applicable) any and all demands, claims, suits, actions, causes of actions, proceedings, assessments and rights in respect of each of the Convertible Securities Documents, including, without limitation, past or present actual, deemed or alleged default or event of default under such Convertible Securities Documents.

1.5 Acknowledgements Regarding Existing Stock. Each of the Exchanging Investors hereby agrees that upon the exchange of its Existing Stock for Shares at the Closing, such Exchanging Investor shall not be entitled to any other consideration in respect of the Existing Stock other than those Shares set forth on Schedule A-1. Upon exchange at the Closing of the Existing Stock for the Shares, the Company shall have no further obligations with respect to such Existing Stock and the Existing Stock exchanged for Shares shall be deemed cancelled. Each Exchanging Investor shall be treated for all purposes as the record holder of such Shares, effective immediately as of the Closing.

2. Representations and Warranties of the Company. The Company hereby represents and warrants to each Investor that, except as set forth on a Schedule of Exceptions (the "Schedule of Exceptions") furnished each Investor, which exceptions shall be deemed to be representations and warranties as if made hereunder:

2.1 Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

2.2 Capitalization and Voting Rights. The authorized capital of the Company consists, or will consist immediately prior to the Initial Closing, of:

(a) Preferred Stock. 105,976,972 shares of Preferred Stock, par value $0.0001 (the "Preferred Stock"), of which 11,964,020 shares have been designated Series A Preferred Stock (the "Series A Preferred Stock"), 18,775,770 shares have been designated Series A-1 Preferred Stock (the "Series A-1 Preferred Stock"), 25,250,000 shares have been designated Series B Preferred Stock (the "Series B Preferred Stock"), 29,778,000 shares have been designated Series C Preferred Stock (the "Series C Preferred Stock"), 9,214,551 shares have been designated Series D Preferred Stock (the "Series D Preferred Stock"), 2,524,068 shares have been designated Series D-1 Preferred Stock (the "Series D-1 Preferred Stock") and 8,470,563 shares have been designated Series D-2 Preferred Stock (the "Series D-2 Preferred Stock"). The rights, privileges and preferences of the Series A Preferred Stock, Series A-1 Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series D-1 Preferred Stock and Series D-2 Preferred Stock will be as stated in the Restated Certificate.

(b) FF Preferred Stock. 5,999,990 shares of FF Preferred Stock, par value $0.0001 (the "FF Preferred"), of which 5,999,990 shares are issued and outstanding.

(c) Common Stock. 240,000,000 shares of common stock, par value $0.0001 (the "Common Stock"), of which 67,847,422 shares are issued and outstanding.

(d) The outstanding shares of Common Stock are all duly and validly authorized and issued, fully paid and nonassessable, and were issued in accordance with the registration or qualification provisions of the Securities Act of 1933, as amended (the "Act"), and any relevant state securities laws, or pursuant to valid exemptions therefrom.

(e) Except for (i) the conversion privileges of the Shares to be issued under this Agreement and the outstanding shares of Preferred Stock and the FF Preferred, (ii) the rights provided in Section 3.4 of that certain Amended and Restated Investors' Rights Agreement in the form attached hereto as Exhibit B (the "Investors' Rights Agreement") and (iii) currently outstanding options to purchase 37,964,832 shares of Common Stock granted to employees and other service providers pursuant to the Company's 2015 Stock Plan (the "Option Plan"), there are not outstanding any options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from the Company of any shares of its capital stock. In addition to the aforementioned options, the Company has reserved an additional 10,277,206 shares of Common Stock for purchase upon exercise of options to be granted in the future under the Option Plan. Other than that certain Amended and Restated Voting Agreement in the form attached hereto as Exhibit C (the "Voting Agreement"), the Company is not a party or subject to any agreement or understanding, and, to the Company's knowledge, there is no agreement or understanding between any persons and/or entities, which affects or relates to the voting or giving of written consents with respect to any security or by a director of the Company.

(f) All outstanding securities of the Company, including, without limitation, all outstanding shares of the capital stock of the Company, all shares of the capital stock of the Company issuable upon the conversion or exercise of all convertible or exercisable

securities and all other securities that the Company is obligated to issue, are subject to a one hundred eighty (180) day "market stand-off" restriction (subject to increase as requested by the Company for compliance with applicable FINRA, marketplace or exchange rules) upon an initial public offering of the Company's securities pursuant to a registration statement filed with the Securities and Exchange Commission ("SEC") pursuant to the Act in a form substantially similar to Section 2.13 of the Investors' Rights Agreement.

2.3 Subsidiaries. The Company does not presently own or control, directly or indirectly, any interest in any other corporation, association, or other business entity. The Company is not a participant in any joint venture, partnership, or similar arrangement. For purposes of the representations and warranties in this Section 2 (other than those in Sections 2.2, 2.4, 2.5, 2.6, and 2.7), references to the "Company" shall mean and include the Company and each of its subsidiaries.

2.4 Authorization. All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement, the Investors' Rights Agreement and the Voting Agreement and that certain Amended and Restated First Refusal and Co-Sale Agreement in the form attached hereto as Exhibit D (the "First Refusal and Co-Sale Agreement" and, together with the Investors' Rights Agreement and the Voting Agreement, the "Ancillary Agreements"), the performance of all obligations of the Company hereunder and thereunder, and the authorization, issuance (or reservation for issuance), sale and delivery of the Shares being sold hereunder and the Conversion Shares has been taken or will be taken prior to the Closing, and this Agreement and the Ancillary Agreements constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

2.5 Valid Issuance of Preferred and Common Stock. The Shares being purchased by the Investors hereunder, when issued, sold and delivered in accordance with the terms of this Agreement for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and the Ancillary Agreements and under applicable state and federal securities laws. The Conversion Shares have been duly and validly reserved for issuance and, upon issuance in accordance with the terms of the Restated Certificate, will be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and the Ancillary Agreements and under applicable state and federal securities laws.

2.6 Governmental Consents. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except (a) the filing of the Restated Certificate with the Secretary of State of the State of Delaware; (b) the filing pursuant

to Regulation D promulgated by the SEC under the Act, the filing pursuant to Section 25102(f) or 25102.1 of the California Corporate Securities Law of 1968, as amended, and the rules thereunder; (c) the filings required by applicable state "blue sky" securities laws, rules and regulations; or (d) such other post-closing filings as may be required.

2.7 Offering. Subject in part to the truth and accuracy of each Investor's representations set forth in Section 3 of this Agreement, the offer, sale and issuance of the Shares as contemplated by this Agreement are exempt from the registration requirements of any applicable state and federal securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption. The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("Disqualification Event"). To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Role 506(e) under the Act. For purposes of this Agreement, "Company Covered Persons" are those persons specified in Rule 506(d)(1) under the Act.

2.8 Litigation. There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, currently threatened against the Company that questions the validity of this Agreement or any Ancillary Agreement, or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that might result, either individually or in the aggregate, in any material adverse changes in the assets, condition or affairs of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.

2.9 Proprietary Information Agreements. Each present and former employee and officer of the Company involved in the creation of Intellectual Property (as defined below) has executed a Proprietary Information and Inventions Agreement, and each consultant to the Company has executed a Consulting Agreement, in substantially the forms provided to special counsel for the Investors. The Company is not aware that any of its present and former employees, officers or consultants are in violation thereof.

2.10 Intellectual Property. The Company possesses sufficient rights to use all patents, trademarks, service marks, trade names, domain names, copyrights, trade secrets, information, proprietary rights and processes ("Intellectual Property") necessary for its business as now conducted and as proposed to be conducted ("Company Intellectual Property") without any violation or, to its knowledge (but without having conducted any special investigation or patent or trademark search), infringement of the rights of others, except for such items as have yet to be conceived or developed or that are expected to be available for licensing on reasonable terms from third parties. The Schedule of Exceptions contains a complete list of all registered patents and pending patent applications and registrations, and applications for trademarks, copyrights, and domain names of the Company. There are no material outstanding options,

licenses, agreements, claims, encumbrances, or shared ownership of interests of any kind relating to anything referred to above in this Section 2.10 that is, to any extent, owned by or exclusively licensed to the Company, nor is the Company bound by or a party to any options, licenses, or agreements of any kind with respect to the patents, trademarks, service marks, trade names, domain names, copyrights, trade secrets, licenses, information, proprietary rights, and/or processes of any other person or entity, except, in either case, for Open Source Licenses (defined below) and generally commercially available object code software products not incorporated into the Company's products or services under standard non-negotiated end-user object code license agreements. The Company has not received any written communications alleging that the Company has violated or, by conducting its business as proposed, would violate any of the Intellectual Property rights of any other person or entity, and the Company is not aware of any potential basis for such an allegation or of any reason to believe that such an allegation may be forthcoming. To the Company's knowledge, no third party is infringing any of the Company Intellectual Property. The Company is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her commercially reasonable efforts to promote the interests of the Company or that would conflict with the Company's business as presently conducted. The Company does not believe it is or will be necessary to utilize any inventions of any of its employees (or people it currently intends to hire) made prior to or outside the scope of their employment by the Company. To the extent the Company uses any "open source" or "copyleft" software in its products or services or is a party to "open" or "public source" or similar licenses with respect to all or any part of its products or services (each, an "Open Source License"), the Company is in compliance with the terms of any such Open Source Licenses, and the Company is not required (and, even if it distributed its software, would not be required) under any such Open Source License to (a) make or permit any disclosure or to make available any source code for its (or any of its licensors') proprietary software or (b) distribute or make available any of the Company's proprietary software or intellectual property (or to permit any such distribution or availability).

2.11 Compliance with Other Instruments. The Company is not in violation, default, conflict or breach in any material respect of any provision of its Restated Certificate or Bylaws, or in any material respect of any instrument, judgment, order, writ, decree, or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to the Company (including, without limitation, those related to export control). The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation, default, conflict or breach, nor will such consummation constitute, with or without the passage of time and giving of notice, an event that results in (a) the creation of any lien, charge or encumbrance upon any assets of the Company or (b) the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization, or approval applicable to the Company, its business or operations or any of its assets or properties.

2.12 Agreements; Action.

(a) Except for agreements explicitly contemplated hereby and by the Ancillary Agreements, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, affiliates, or any affiliate thereof.

(b) There are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound that may involve (i) obligations (contingent or otherwise) of, or payments to the Company in excess of, $250,000, or (ii) any material license of any Intellectual Property to or from the Company (other than (A) the nonexclusive license of the Company's software and products in object code form in the ordinary course of business pursuant to standard end-user agreements the forms of which have been provided to special counsel for the Investors, (B) the nonexclusive license to the Company of standard, generally commercially available, "off-the-shelf" third party object code software products and services not incorporated into the Company's products or services, or (C) Open Source Licenses), or (iii) provisions materially restricting the development, manufacture or distribution of the Company's products or services.

(c) The Company has not (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed individually in excess of $250,000 or, in the case of indebtedness and/or liabilities individually less than $250,000, in excess of $500,000 in the aggregate, (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its material assets or rights, other than the sale of its inventory in the ordinary course of business.

(d) For the purposes of subsections (b) and (c) above, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same person or entity (including persons or entities the Company has reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

2.13 Financial Statements. The Company has delivered to each Investor its unaudited financial statements (balance sheet and income statement) for fiscal year 2020 (the "Financial Statements"). The Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods indicated and with each other, except that the unaudited Financial Statements may not contain all footnotes required by generally accepted accounting principles. The Financial Statements fairly present the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no material liabilities, contingent or otherwise, other than (a) liabilities incurred in the ordinary course of business subsequent to December 31, 2020 (the "Financial Statement Date") and (b) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in the Financial Statements, which, in both cases, individually or in the aggregate, are not material to the financial condition or operating results of the Company. Except as disclosed in the Financial

Statements, the Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation.

2.14 Changes. Since the Financial Statement Date there has not been:

(a) any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not been, in the aggregate, materially adverse;

(b) any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operating results, prospects or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(c) any waiver by the Company of a valuable right or of a material debt owed to it;

(d) any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(e) any material change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject;

(f) any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g) any sale, assignment or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets;

(h) any resignation or termination of employment of any key officer of the Company; and the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such officer or key employee;

(i) receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(j) any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(k) any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(l) any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(m) to the Company's knowledge, any other event or condition of any character that might materially and adversely affect the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted); or

(n) any agreement or commitment by the Company to do any of the things described in this Section 2.14.

2.15 Related-Party Transactions. No employee, officer, or director of the Company (a "Related Party") or member of such Related Party's immediate family, or any corporation, partnership or other entity in which such Related Party is an officer, director or partner, or in which such Related Party has significant ownership interests or otherwise controls, is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them. No Related Party or member of their immediate family is directly or indirectly interested in any material contract with the Company.

2.16 Permits. The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could materially and adversely affect the business, properties or financial condition of the Company. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.17 Minute Books. The minute books of the Company provided to the Investors contain a complete summary of all meetings of directors and stockholders since the time of incorporation and reflect all transactions referred to in such minutes accurately in all material respects.

2.18 Employee Benefit Plans. Except as disclosed on Schedule 2.18 attached hereto, the Company does not maintain any "employee benefit plans" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Each such employee benefit plan (and each related trust, insurance contract, or fund) maintained by the Company has been maintained, funded and administered in accordance with the terms of such employee benefit plan and complies in form and in operation with the applicable requirements of ERISA and the Internal Revenue Code of 1986, as amended (the "Code"). All contributions (including all employer contributions and employee salary reduction contributions) which are due have been made to each such employee benefit plan which is an "employee pension benefit plan" within the meaning of ERISA. All premiums or other payments which are due have been paid with respect to each such employee benefit plan which is an "employee welfare benefit plan" within the meaning of ERISA. Each such employee benefit plan which is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that such employee benefit plan meets the requirements of Section 401(a). With respect to each employee benefit plan that the Company maintains or has maintained during the prior six years or to which the Company

contributes, or has been required to contribute at any time during the prior six years, no action, suit, proceeding, hearing, or (to the Company's knowledge) investigation with respect to the administration or the investment of the assets of such employee benefit plan (other than routine claims for benefits) is pending or, to the Company's knowledge, threatened.

2.19 Tax Returns, Payments and Elections. The Company has filed all tax returns and reports (including information returns and reports) as required by law. These returns and reports are true and correct in all material respects. The Company has paid all taxes and other assessments due, except those contested by it in good faith that are listed in the Schedule of Exceptions. The provision for taxes of the Company as shown in the Financial Statements is adequate for taxes due or accrued as of the date thereof. The Company has not elected pursuant to the Internal Revenue Code of 1986, as amended (the "Code"), to be treated as a Subchapter S corporation or a collapsible corporation pursuant to Section 1362(a) or Section 341(f) of the Code, nor has it made any other elections pursuant to the Code (other than elections that relate solely to methods of accounting, depreciation or amortization) that would have a material effect on the Company, its financial condition, its business as presently conducted or any of its properties or material assets. The Company has never had any tax deficiency proposed or assessed against it and has not executed any waiver of any statute of limitations on the assessment or collection of any tax or governmental charge. None of the Company's federal income tax returns and none of its state income or franchise tax or sales or use tax returns has ever been audited by governmental authorities. Since the Financial Statement Date, the Company has not incurred any taxes, assessments or governmental charges other than in the ordinary course of business and the Company has made adequate provisions on its books of account for all taxes, assessments and governmental charges with respect to its business, properties and operations for such period. The Company has withheld or collected from each payment made to each of its employees, the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or authorized depositories. The Company is not a party to any contract and/or has not granted any compensation, equity or award that could be deemed deferred compensation subject to the additional twenty percent (20%) tax under Section 409A of the Code, and neither the Company nor any person that is a member of the same controlled group as the Company or under common control with the Company within the meaning of Section 414 of the Code has any liability or obligation to make any payments or to issue any equity award or bonus that could be deemed deferred compensation subject to the additional twenty percent (20%) tax under Section 409A of the Code. No claim has been made by any governmental authority in a jurisdiction where the Company does not file tax returns that the Company is or may be subject to taxation by that jurisdiction.

2.20 Insurance. Schedule 2.20 of the Schedule of Exceptions contains a complete list of the Company's current insurance policies, together with a summary of coverage amounts with regards to each such policy, and each such policy is in full force and effect with extended coverage, sufficient in amount (subject to reasonable deductibles) to allow it to replace any of its properties that might be damaged or destroyed.

2.21 Labor Agreements and Actions; Employee Compensation.

(a) The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the Company's knowledge, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, that could have a material adverse effect on the assets, properties, financial condition, operating results, or business of the Company (as such business is presently conducted), nor is the Company aware of any labor organization activity involving its employees. The Company is not aware that any officer or key employee, or that any group of key employees, intends to terminate their employment with the Company, nor does the Company have a present intention to terminate the employment of any of the foregoing. The employment of each officer and employee of the Company is terminable at the will of the Company.

(b) To its knowledge, the Company has complied in all material respects with all applicable state and federal equal employment opportunity and other laws related to employment. The Company is not a party to or bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, or other employee compensation agreement.

2.22 Registration Rights. Except as provided in the Investors' Rights Agreement, the Company has not granted or agreed to grant any registration rights, including piggyback rights, to any person or entity.

2.23 Data Privacy. In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively, "Personal Information"), the Company is and has been, to the Company's knowledge, in compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies, reputable industry practice, and the requirements of any contract or codes of conduct to which the Company is a party. The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations. Since March 1, 2015, the Company has provided accurate notice of its privacy practices on all of its websites, and such notices have not contained any material omissions of the Company's privacy practices and have not been materially misleading, deceptive or in violation of any applicable laws in any relevant jurisdictions.

2.24 Disclosure. The Company has fully provided each Investor with all the information that such Investor has requested for deciding whether to purchase the Shares. To the Company's knowledge, no certificates made or delivered in connection with this Agreement or the Ancillary Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein or therein not misleading.

2.25 Foreign Corrupt Practices Act. To the Company's knowledge, none of the Company nor any of the Company's directors, officers or employees have made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (a) any foreign official (as such term is defined in the U.S. Foreign Corrupt Practices Act (the "FCPA")) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a governmental authority or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, in the case of both (a) and (b) above in order to assist the Company or any of its affiliates to obtain or retain business for, or direct business to the Company or any of its affiliates, as applicable. None of the Company nor any of its directors, officers or employees has made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation.

3. Representations and Warranties of the Investors. Each Investor, severally and not jointly, hereby represents and warrants that:

3.1 Authorization. Such Investor has full power and authority to enter into this Agreement and the Ancillary Agreements, and each such Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2 Purchase Entirely for Own Account. This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Shares to be received by such Investor and the Conversion Shares (collectively, the "Securities") will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.

3.3 Disclosure of Information. Such Investor believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Such Investor further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Shares and the business, properties, prospects and financial condition of the Company. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Investors to rely thereon.

3.4 Investment Experience. Such Investor is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares. If other than an individual, Investor also represents it has not been organized for the purpose of acquiring the Shares.

3.5 Accredited Investor. Such Investor is an "accredited investor" within the meaning of SEC Rule 501 of Regulation D, as presently in effect.

3.6 Restricted Securities. Such Investor understands that the Securities will be characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. In this connection, such Investor represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

3.7 Legends. It is understood that the certificates evidencing the Securities may bear one or all of the following legends:

(a) "THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT."

(b) Any legend required by the General Corporation Law of the State of Delaware or by applicable state "blue sky" securities laws, rules and regulations.

3.8 Exculpation Among Investors. Each Investor acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. Each Investor agrees that no Investor nor the respective controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

3.9 Further Representations by Foreign Investors. If an Investor is not a United States person, such Investor hereby represents that he or she has satisfied himself or herself as to the full observance of the laws of his or her jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (a) the legal requirements within his jurisdiction for the purchase of the Securities, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to

the purchase, holding, redemption, sale, or transfer of the Securities. Such Investor's subscription and payment for, and his or her continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of his or her jurisdiction.

4. Conditions of Investors' Obligations at Closing. The obligations of each Investor under subsection 1.1(c) of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions, the waiver of which shall not be effective against any Investor who does not consent thereto, except that Sections 4.1, 4.3, and 4.6 need not be fulfilled for subsequent sales of the Shares pursuant to Section 1.3 hereof.

4.1 Representations and Warranties. The representations and warranties of the Company contained in Section 2 shall be true on and as of the Closing.

4.2 Performance. The Company shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

4.3 Compliance Certificate. The President of the Company shall deliver to each Investor at the Initial Closing a certificate stating that the conditions specified in Sections 4.1 and 4.2 have been fulfilled.

4.4 Qualifications. All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be duly obtained and effective as of the Closing.

4.5 Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Investors, and they shall have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

4.6 Secretary's Certificate. The Secretary of the Company shall deliver to each Investor at the Initial Closing a certificate stating that the copies of the Company's Restated Certificate and Bylaws and Board of Director and stockholder resolutions relating to the sale of the Shares attached thereto are true and complete copies of such documents and resolutions.

4.7 Proprietary Information and Employee Stock Purchase Agreements. Each employee of the Company shall have entered into a Proprietary Information and Inventions Agreement, and each consultant to the Company shall have entered into a Consulting Agreement, substantially in the form previously provided or made available to the Investors.

4.8 Board of Directors. The directors of the Company shall initially be Jeffrey Cavins, Jennifer Young, Anthony Lee and Kim Armor.

4.9 Investors' Rights Agreement. The Company and each Investor shall have entered into the Investors' Rights Agreement in the form attached as Exhibit B.

4.10 Voting Agreement. The Company, each Investor and each of Jeffrey Cavins, Jennifer Young, Ryan Quinn and Tyler Bunnell (collectively, the "Founders") shall have entered into the Voting Agreement in the form attached hereto as Exhibit C.

4.11 First Refusal and Co-Sale Agreement. The Company, each Investor and each of the Founders shall have entered into the First Refusal and Co-Sale Agreement in the form attached hereto as Exhibit D.

5. Conditions of the Company's Obligations at Closing. The obligations of the Company to each Investor under this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions by that Investor:

5.1 Representations and Warranties. The representations and warranties of the Investors contained in Section 3 shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

5.2 Payment of Purchase Price. The Investor shall have delivered the purchase price specified in Section 1.1(c).

5.3 Qualifications. All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be duly obtained and effective as of the Closing.

6. Miscellaneous.

6.1 Survival of Warranties. The warranties, representations and covenants of the Company and Investors contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Investors or the Company.

6.2 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any Securities). Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.3 Governing Law. This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among California residents entered into and to be performed entirely within Delaware.

6.4 Counterparts. This Agreement may be executed by electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument. Counterparts may be delivered by facsimile, electronic mail (including pdf) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.5 Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.6 Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the addresses set forth on the signature pages attached hereto (or at such other addresses as shall be specified by notice given in accordance with this Section 6.6).

6.7 Finder's Fee. Each party represents that it neither is nor will be obligated for any finders' fee or commission in connection with this transaction. Each Investor agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its officers, partners, employees, or representatives is responsible.

The Company agrees to indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

6.8 Expenses. Each party shall pay its respective costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the Ancillary Agreements or the Restated Certificate, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

6.9 Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Investors holding a majority of the Conversion Shares issued or issuable upon conversion of the Shares purchased hereunder. Any amendment or waiver effected in accordance with this section shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including, without limitation, securities into which such securities are convertible), each future holder of all such securities, and the Company.

6.10 Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.11 Corporate Securities Law. THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION FOR SUCH SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

6.12 Aggregation of Stock. All shares of the Preferred Stock held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

6.13 Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein.

6.14 Waiver of Conflicts. Each party to this Agreement acknowledges that BraunHagey & Borden LLP ("BHB"), counsel for the Company, has in the past and may continue to perform legal services for certain of the Investors in matters unrelated to the transactions described in this Agreement, including the representation of such Investors in venture capital financings and other matters. Accordingly, each party to this Agreement hereby (a) acknowledges that they have had an opportunity to ask for information relevant to this disclosure; (b) acknowledges that BHB represented the Company in the transaction contemplated by this Agreement and has not represented any individual Investor or any individual stockholder or employee of the Company in connection with such transaction; and (c) gives its informed written consent to BHB's representation of certain of the Investors in such unrelated matters and to BHB's representation of the Company in connection with this Agreement and the transactions contemplated hereby.

6.15 Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of California and to the jurisdiction of the United States District Court for the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of California or the United States District Court for the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the foregoing courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

<u>WAIVER OF JURY TRIAL</u>: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[*Remainder of page intentionally left blank*]

DocuSign Envelope ID: 5B359AE8-0854-48F8-857C-0DEC162E68D3

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**OUTDOORSY HOLDINGS, INC.**

By: DocuSigned by: Jeffrey Cavins CD859B318ABA470...

Name: Jeffrey Cavins

Title: President and Chief Executive Officer

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

**LTC (BVI) LTD**

By: ______________________

Name: Yiannoula Antoniou

Title: Director

Address: Tropic Isle Building, P.O. Box 3423
Road Town, Tortola
British Virgin Islands

# Exhibit D

**PRIVILEGED AND CONFIDENTIAL**

SF SHARTSIS FRIESE LLP

One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

REDACTED

July 6, 2022
Invoice # 5458283
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through June 30, 2022:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | $8,360.50 | $ [redacted] |
| Total Disbursements Advanced | | $ [redacted] |
| **TOTAL THIS INVOICE** | | **$** [redacted] |
| Previous Balance | | $ [redacted] |
| **TOTAL BALANCE DUE** | $8,360.50 | **$** [redacted] |

Invoice #: 5458283 July 6, 2022

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| 6/13/22 | SSG | Confer with F. Cialone regarding removal; review removal papers | .30 |
| 6/14/22 | JZ | Emails with F. Cialone regarding removal (.10) | .10 |
| 6/14/22 | FAC | Review Answer; review Removal; research regarding removal issue; conference with S. Ganjam | .80 |
| 6/14/22 | SSG | Review removal papers, research and analysis regarding same; confer with F. Cialone regarding same; email with J. Stellato regarding [redacted] | 1.60 |
| 6/15/22 | JZ | Review of removal documents and emails regarding strategy on remand (.30) | .30 |
| 6/15/22 | SSG | Draft Motion to Remand; confer with J. Zeldin, F. Cialone regarding same | .90 |
| 6/16/22 | JZ | Conference with F. Cialone regarding [redacted] strategies (.10) | .10 |
| 6/16/22 | FAC | Conference with J. Zeldin; email to S. Ganjam | .10 |
| 6/16/22 | SSG | Confer with F. Cialone regarding [redacted], strategy for remand motion | .20 |
| 6/21/22 | SSG | Review pleadings and court documents | .10 |
| 6/23/22 | SSG | Draft opposition to motion to remand; research and analysis regarding same | 1.20 |
| 6/28/22 | SSG | Confer with F. Cialone regarding [redacted] draft meet and confer letter to BraunHagey | .30 |
| 6/29/22 | FAC | Review notices; emails with S. Ganjam | .20 |
| 6/29/22 | SSG | Brief review of motion for judgment on pleadings; confer with F. Cialone regarding same | .20 |
| 6/30/22 | JZ | Quick review of BraunHagey motion for judgment on the pleading (.20); conference with S. Ganjam on our motion to remand and their motion for judgment on the pleadings (.50) | .70 |
| 6/30/22 | SSG | Draft meet and confer letter regarding remand and motion for judgment on the pleading; confer with F. Cialone and J. Zeldin regarding same; draft opposition to motion to remand; research and analysis regarding same | 4.70 |

**TOTAL PROFESSIONAL SERVICES** $8,360.50 [redacted]

Invoice #: 5458283 July 6, 2022

REDACTED

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Joel Zeldin | 1.20 | 890.00 | 1,068.00 |
| Frank A. Cialone | 1.10 | 800.00 | 880.00 |
| Sanjeet Ganjam | 9.50 [redacted] | 675.00 | $6,412.50 [redacted] |
| **TOTALS** | 11.80 [redacted] | | $8,360.50 [redacted] |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| | [redacted] | [redacted] |

**TOTAL DISBURSEMENTS ADVANCED** [redacted]

**TOTAL THIS INVOICE** $8,360.50 [redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

August 3, 2022
Invoice # 5459635
Billing Atty. FAC

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through July 31, 2022:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 41,563.50 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | $41,563.50 [redacted] |

Invoice #: 5459635 August 3, 2022

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 7/01/22 | JZ | Review and revise letter to Fisher; emails with S. Ganjam regarding same; review of final email (.4) | .40 |
| 7/01/22 | FAC | Review and comment on draft letter; emails regarding same | .20 |
| 7/01/22 | SSG | Revise and send meet and confer letter regarding remand and motion for judgment on the pleading; confer with F. Cialone and J. Zeldin regarding same | 2.80 |
| 7/05/22 | SSG | Draft motion to remand (4.0), opposition to MJOP; research and analysis for same | 5.60 |
| 7/06/22 | JZ | Review email from Fisher and emails among team on response (.2) | .20 |
| 7/06/22 | SSG | Draft motion to remand, opposition to MJOP; research and analysis for same (6.5); email with R. Fisher regarding meet and confer; confer with F. Cialone, J. Zeldin regarding same | 7.40 |
| 7/07/22 | JZ | Read Fisher and other emails, and email to team (.2) | .20 |
| 7/07/22 | FAC | Review email from opposing counsel; emails with R. Rahmil and J. Zeldin | .20 |
| 7/07/22 | SSG | Draft motion to remand; research and analysis for same (3.0); email with R. Fisher regarding meet and confer; confer with F. Cialone, J. Zeldin regarding same | 3.50 |
| 7/08/22 | JZ | Read and edit papers on Motion to Remand (1.0); conference with S. Ganjam regarding same (.2); draft insert (.2) | 1.40 |
| 7/08/22 | SSG | Draft motion to remand (3.0); confer with F. Cialone, J. Zeldin, J. Stellato regarding [redacted] draft opposition to MJOP | 7.30 |
| 7/10/22 | SSG | Draft opposition to MJOP | 3.90 |
| 7/11/22 | FAC | Emails; draft motion to remand; conference with S. Ganjam | .50 |
| 7/11/22 | SSG | Revise motion to remand and supporting papers; draft opposition to MJOP; draft administrative motion to continue hearing date | 10.30 |
| 7/11/22 | AJH | Analyze and revise draft motion to remand | 1.20 |
| 7/11/22 | AJH | Prepare exhibits to motions for filing | .30 |
| 7/11/22 | AJH | Prepare attorney declaration in support of motion to remand | .70 |
| 7/11/22 | AJH | Analyze and revise motion for administrative relief | .30 |
| 7/12/22 | JZ | Read Administrative Motion to delay Motion for Judgment on the Pleadings (.10); read Order and send email (.10) | .20 |

Invoice #: 5459635 REDACTED August 3, 2022

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 7/12/22 | SSG | Revise and file motion to remand and supporting papers; draft opposition to MJOP; revise and file administrative motion to continue hearing date | 10.60 |
| 7/13/22 | SSG | Emails with F. Cialone, J. Zeldin regarding open issues | .10 |
| 7/14/22 | SSG | Email with J. Stellato | .10 |
| 7/26/22 | SSG | Review opposition to motion to remand; confer with F. Cialone regarding same | .30 |
| 7/27/22 | FAC | Review Opposition to Remand Motion | .30 |
| 7/27/22 | SSG | Draft reply brief regarding motion to remand; confer with J. Stellato and F. Cialone regarding [redacted] | 1.30 |
| 7/28/22 | SSG | Draft reply brief | 2.40 |

**TOTAL PROFESSIONAL SERVICES** **$ 41,563.50**

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Joel Zeldin | 2.40 | 890.00 | 2,136.00 |
| Frank A. Cialone | 1.20 | 800.00 | 960.00 |
| Sanjeet Ganjam | 55.60 | 675.00 | 37,530.00 |
| Hudson, Amanda J. | 2.50 | 375.00 | 937.50 |
| **TOTALS** | **61.70** | | **$ 41,563.50** |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

**TOTAL DISBURSEMENTS ADVANCED** [redacted]

**TOTAL THIS INVOICE** $41,563.50 $[redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

September 7, 2022
Invoice # 5461139
Billing Atty. FAC

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through August 31, 2022:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | $11,535.50 | [redacted] |
| Total Disbursements Advanced | | [redacted] |
| **TOTAL THIS INVOICE** | $11,535.50 | [redacted] |
| Previous Balance | | [redacted] |
| **TOTAL BALANCE DUE** | | [redacted] |

Invoice #: 5461139 September 7, 2022

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 8/01/22 | FAC | Draft Reply | .30 |
| 8/01/22 | SSG | Draft Reply brief in support of Motion to Remand | 5.80 |
| 8/02/22 | JZ | Read reply papers (.10) | .10 |
| 8/02/22 | SSG | Revise and file Reply brief in support of Motion to Remand | 1.30 |
| 8/02/22 | AJH | Analyze and revise draft reply in support of motion to remand | 1.40 |
| 8/02/22 | AJH | Prepare and revise draft attorney declaration in support of reply to motion to remand | .30 |
| 8/15/22 | SSG | Review Order regarding remand, report [redacted] to J. Stellato | .60 |
| 8/16/22 | FAC | Review Order; review notices; conference and emails with S. Ganjam; email to client | .50 |
| 8/16/22 | SSG | Confer with F. Cialone; J. Zeldin regarding strategy for responding to notice of appeal; research and analysis regarding same | 2.20 |
| 8/16/22 | JZ | Read order granting remand, consider BraunHagey's notice of appeal, and emails with F. Cialone and S. Ganjam regarding response to notice of appeal (.30) | .30 |
| 8/17/22 | SSG | Email with J. Stellato, F. Cialone regarding [redacted] | .50 |
| 8/18/22 | SSG | Confer with F. Cialone regarding strategy for [redacted] | .20 |
| 8/19/22 | SSG | Confer with F. Cialone regarding strategy for [redacted] | .10 |
| 8/22/22 | SSG | Check state court docket for remand status; confer with F. Cialone regarding strategy for [redacted]; research and analysis regarding [redacted] | 1.80 |
| 8/22/22 | JZ | Review and send emails regarding appeal and affect (.10) | .10 |
| 8/23/22 | FAC | Emails regarding appeal issues, discovery | .20 |
| 8/23/22 | SSG | Confer with F. Cialone regarding strategy for responding to appeal; emails with J. Stellato regarding [redacted] | .70 |
| 8/23/22 | JZ | Review court notice regarding remand and email to F. Cialone and S. Ganjam (.10 | .10 |
| 8/24/22 | FAC | Email with J. Stellato | .10 |
| 8/26/22 | SSG | Confer with J. Zeldin regarding strategy for appeal | .20 |
| 8/26/22 | JZ | Review multiple pleadings and order regarding appeal, emails regarding same (.10) | .10 |

Invoice #: 5461139 REDACTED September 7, 2022

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 8/27/22 | FAC | Emails regarding appeal; review Notice from Clerk | .10 |
| 8/28/22 | SSG | Confer with F. Cialone regarding [redacted] | .10 |
| 8/29/22 | SSG | Confer with J. Stellato regarding [redacted] | .30 |
| [redacted] | [redacted] | [redacted] | [redacted] |

**TOTAL PROFESSIONAL SERVICES** $11,535.50 [redacted]

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Joel Zeldin | .10 | 890.00 | 89.00 |
| Frank A. Cialone | 1.20 | 800.00 | 960.00 |
| Sanjeet Ganjam | 13.80 [redacted] | 675.00 | $9,315.00 [redacted] |
| Joel Zeldin | .60 | 890.00 | 534.00 |
| Hudson, Amanda J. | 1.70 | 375.00 | 637.50 |
| **TOTALS** | 17.40 [redacted] | | $11,535.50 [redacted] |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| | [redacted] | [redacted] |

**TOTAL DISBURSEMENTS ADVANCED** [redacted]

**TOTAL THIS INVOICE** $11,535.50 [redacted]

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

SF SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

December 5, 2022
Invoice # 5466490
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through November 30, 2022:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | $1,293.50 | [redacted] |
| Total Disbursements Advanced | | [redacted] |
| **TOTAL THIS INVOICE** | **$1,293.50** | [redacted] |

Invoice #: 5466490 December 5, 2022

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 11/21/22 | FAC | Email regarding appeal | .10 |
| 11/21/22 | SSG | Brief review of BH's appellate brief; email to J. Stellato regarding [redacted] emails with J. Zeldin. F. Cialone regarding strategy for [redacted] | .40 |
| 11/21/22 | JZ | Quick review of BH's opening appellate brief and email to S. Ganjam on [redacted] (.9) | .90 |
| 11/22/22 | SSG | Email with J. Stellato regarding [redacted] | .10 |
| 11/22/22 | AJH | Compile filings and transmit | .20 |

**TOTAL PROFESSIONAL SERVICES** **$1,293.50** [redacted]

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Frank A. Cialone | .10 | 800.00 | 80.00 |
| Sanjeet Ganjam | 0.50 [redacted] | 675.00 | 337.50 [redacted] |
| Joel Zeldin | .90 | 890.00 | 801.00 |
| Hudson, Amanda J. | .20 | 375.00 | 75.00 |
| **TOTALS** | **1.70** [redacted] | | **$1,293.50** [redacted] |

**TOTAL THIS INVOICE** **$1,293.50** [redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

January 6, 2023
Invoice # 5467876
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through December 31, 2022:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | | $ 15,417.00 |
| Total Disbursements Advanced | | [redacted] |
| **TOTAL THIS INVOICE** | **$15,417.00** | [redacted] |
| Previous Balance | | [redacted] |
| **TOTAL BALANCE DUE** | | [redacted] |

Invoice #: 5467876

January 6, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 12/13/22 | SSG | Emails with J. Stellato regarding [redacted] | .20 |
| 12/14/22 | SSG | Confer with J. Zeldin, J. Stellato regarding strategy for [redacted]; review draft brief; revise same | 1.70 |
| 12/14/22 | JZ | Review notes on BraunHagey brief (.1); read BraunHagey brief (.6); read draft of opposition and revise (1.9); emails with S. Ganjam (.1) | 2.70 |
| 12/15/22 | SSG | Confer with J. Zeldin regarding [redacted] | .20 |
| 12/15/22 | JZ | Conference with S. Ganjam regarding [redacted] (.2) | .20 |
| 12/16/22 | SSG | Revise appellate brief; review and conform brief to local rules | 6.20 |
| 12/16/22 | JZ | Brief F. Cialone regarding [redacted] (.1) | .10 |
| 12/17/22 | FAC | Review and revise draft appellate brief | .40 |
| 12/17/22 | SSG | Confer with J. Zeldin, F. Cialone regarding [redacted] | .10 |
| 12/17/22 | JZ | Review and edit revised opposition brief (1.0) | 1.00 |
| 12/18/22 | SSG | Revise appellate brief | .90 |
| 12/19/22 | SSG | Revise and file appellate brief including conference with JZ | 4.70 |
| 12/19/22 | JZ | Conference with S. Ganjam regarding [redacted] (.2) | .20 |
| 12/19/22 | CRB | Cite check and edit appeal response brief; finalize formatting issues and communications with S. Ganjam regarding same | 3.10 |
| 12/20/22 | SSG | Confer with C. Berggren regarding hard copies of briefs to court; email with J. Stellato regarding [redacted] | .20 |
| 12/20/22 | CRB | Review for [redacted] per S. Ganjam request and communications regarding same | .40 |
| 12/21/22 | SSG | Confer with C. Berggren regarding [redacted] | .20 |
| 12/21/22 | CRB | Communications regarding [redacted] | .20 |
| 12/22/22 | SSG | Confer with C. Berggren regarding [redacted] | .10 |
| 12/28/22 | SSG | Emails regarding calendaring, notices | .10 |
| 12/30/22 | SSG | Emails regarding BHB's request for extension | .20 |

**TOTAL PROFESSIONAL SERVICES** **$ 15,417.00**

Invoice #: 5467876 January 6, 2023

REDACTED

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Frank A. Cialone | .40 | 800.00 | 320.00 |
| Sanjeet Ganjam | 14.80 | 675.00 | 9,990.00 |
| Joel Zeldin | 4.20 | 890.00 | 3,738.00 |
| Chris R. Berggren | 3.70 | 370.00 | 1,369.00 |
| **TOTALS** | **23.10** | | **$ 15,417.00** |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

**TOTAL DISBURSEMENTS ADVANCED** [redacted]

**TOTAL THIS INVOICE** **$15,417.00** [redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

February 6, 2023
Invoice # 5469126
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through January 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 147.00 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | **$ 147.00** |

Invoice #: 5469126 February 6, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 1/10/23 | SSG | Email with J. Stellato regarding [redacted] | .10 |
| 1/24/23 | SSG | Confer with F. Cialone regarding [redacted] | .10 |
| | | **TOTAL PROFESSIONAL SERVICES** | **$ 147.00** |

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | .20 | 735.00 | 147.00 |
| **TOTALS** | **.20** | | **$ 147.00** |

**TOTAL THIS INVOICE** **$ 147.00**

SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

March 6, 2023
Invoice # 5470398
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

## INVOICE SUMMARY

For professional services rendered and costs advanced through February 28, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 1,493.50 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | **$ 1,493.50** |
| Previous Balance | [redacted] |
| **TOTAL BALANCE DUE** | [redacted] |

Invoice #: 5470398 March 6, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 2/22/23 | SSG | Confer with J. Zeldin regarding [redacted] | .10 |
| 2/23/23 | SSG | Review Reply brief from BHB; confer with J. Stellato regarding [redacted] | .60 |
| 2/23/23 | JZ | Read BraunHagey reply papers and email [redacted] to S. Ganjam (1.10) | 1.10 |
| | | **TOTAL PROFESSIONAL SERVICES** | **$ 1,493.50** |

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | .70 | 735.00 | 514.50 |
| Joel Zeldin | 1.10 | 890.00 | 979.00 |
| **TOTALS** | **1.80** | | **$ 1,493.50** |

**TOTAL THIS INVOICE** **$ 1,493.50**

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

April 5, 2023
Invoice # 5474177
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through March 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 73.50 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | **$ 73.50** |

Invoice #: 5474177

April 5, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 3/30/23 | SSG | Email to J. Stellato regarding [redacted] | .10 |
| | | **TOTAL PROFESSIONAL SERVICES** | **$ 73.50** |

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | .10 | 735.00 | 73.50 |
| **TOTALS** | **.10** | | **$ 73.50** |

**TOTAL THIS INVOICE** **$ 73.50**

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

May 3, 2023
Invoice # 5475447
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through April 30, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 73.50 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | **$ 73.50** |
| Previous Balance | [redacted] |
| **TOTAL BALANCE DUE** | [redacted] |

Invoice #: 5475447 May 3, 2023

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 4/30/23 | SSG | Review order setting oral argument | .10 |
| | | **TOTAL PROFESSIONAL SERVICES** | **$ 73.50** |

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | .10 | 735.00 | 73.50 |
| **TOTALS** | **.10** | | **$ 73.50** |

**TOTAL THIS INVOICE** **$ 73.50**

SF SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

June 5, 2023
Invoice # 5476814
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
Stellato Law
75 Park Lane
Old Knebworth
Hertfordshire United Kingdom SG3 6PP

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through May 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | $994.50 | [redacted] |
| Total Disbursements Advanced | | [redacted] |
| **TOTAL THIS INVOICE** | $994.50 | [redacted] |
| Previous Balance | | [redacted] |
| **TOTAL BALANCE DUE** | | [redacted] |

Invoice #: 5476814 June 5, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 5/01/23 | SSG | Review order scheduling oral argument; confer with J. Zeldin regarding [redacted] | .10 |
| 5/01/23 | JZ | Review court's notice and referenced rules and protocols for oral argument (.20); email to F. Cialone and S. Ganjam regarding [redacted] (.20) | .40 |
| 5/02/23 | SSG | Email to J. Stellato regarding [redacted] | .40 [redacted] |
| 5/04/23 | SSG | Email with J. Stellato regarding [redacted] | .10 |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 5/30/23 | SSG | Confer with F. Cialone, J. Zeldin regarding [redacted] | .10 |
| 5/30/23 | JZ | Miscellaneous emails and brief conference with F. Cialone, and brief conference with F. Cialone (.10) | .10 |

**TOTAL PROFESSIONAL SERVICES** $994.50 [redacted]

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | .70 [redacted] | 735.00 | 514.50 [redacted] |
| Joel Zeldin | .50 | 960.00 | 480.00 |
| **TOTALS** | **1.20** [redacted] | | $994.50 [redacted] |

**TOTAL THIS INVOICE** **$994.50** [redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 ♦
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

July 6, 2023
Invoice # 5478131
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through June 30, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 17,210.50 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | **$ 17,210.50** |

Invoice #: 5478131 July 6, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 6/13/23 | SSG | Prepare/submit notice of acknowledgement of oral argument (.40) | .40 |
| 6/20/23 | JZ | Assemble binder to prepare for moot court and oral argument (.10) | .10 |
| 6/24/23 | SSG | Confer with J. Zeldin, F. Cialone regarding [redacted] (.10) | .10 |
| 6/25/23 | JZ | Read and highlight papers on the remand motion (1.80); read all appellate briefs (1.50); read [redacted] (.40); list [redacted] (1.10) | 4.80 |
| 6/26/23 | SSG | Prepare for oral argument (1.20) | 1.20 |
| 6/27/23 | FAC | Review briefing and preparation for moot argument (1.30) | 1.30 |
| 6/27/23 | SSG | Prepare for oral argument (3.70) | 3.70 |
| 6/27/23 | JZ | Outline [redacted], formulation of [redacted], list of [redacted] for oral argument (1.40) | 1.40 |
| 6/28/23 | FAC | Oral argument preparation session (1.60) | 1.60 |
| 6/28/23 | SSG | Moot oral argument with J. Zeldin and F. Cialone (2.0); prepare for same (1.20) | 3.20 |
| 6/28/23 | JZ | Review [redacted], plus other documents (.40); moot court session with S. Ganjam and F. Cialone, [redacted] (1.60); follow up with S. Ganjam on [redacted] (.40) | 2.40 |
| | | **TOTAL PROFESSIONAL SERVICES** | **$ 17,210.50** |

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Frank A. Cialone | 2.90 | 875.00 | 2,537.50 |
| Sanjeet S. Ganjam | 8.60 | 735.00 | 6,321.00 |
| Joel Zeldin | 8.70 | 960.00 | 8,352.00 |
| **TOTALS** | **20.20** | | **$ 17,210.50** |

**TOTAL THIS INVOICE** **$ 17,210.50**

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

August 3, 2023
Invoice # 5479338
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through July 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $ 21,013.00 |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | $21,013.00 [redacted] |

Invoice #: 5479338 August 3, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 7/06/23 | SSG | Telephone conf. with J. Stellato (0.3); emails; prepare for oral argument (0.6) | .90 |
| 7/06/23 | JZ | Review [redacted] and email to S. Ganjam (.40); other emails with F. Cialone and S. Ganjam (.20); review of notes and emails to Stellato (.40) | 1.00 |
| 7/07/23 | FAC | Moot court hearing | 1.00 |
| 7/07/23 | SSG | Oral Argument Moot (2.0); prepare for oral argument (1.8) | 3.80 |
| 7/07/23 | JZ | Prepare for second moot court (.20); second moot court with S. Ganjam, joined by F. Cialone for parts (1.80) | 2.00 |
| 7/07/23 | CRB | Conference with S. Ganjam regarding binder needed for upcoming oral argument; compile briefs and authorities regarding same | .70 |
| 7/08/23 | CRB | Compile briefs and authorities for hearing binder for upcoming oral arguments per S. Ganjam request | .40 |
| 7/10/23 | SSG | Prepare for oral argument | 1.80 |
| 7/11/23 | SSG | Zoom conf. with J. Zeldin for oral argument moot (.80); prepare for oral argument (1.50) | 2.30 |
| 7/11/23 | JZ | Final preparation with S. Ganjam for oral argument (.80); final review of trial court order and briefs on appeal (.70); email to S. Ganjam (.10) | 1.60 |
| 7/12/23 | SSG | Attend oral argument | 3.50 |
| 7/12/23 | JZ | Attend oral argument in 9th Circuit, including meeting before hearing and transportation (3.30) | 3.30 |
| 7/13/23 | JZ | [redacted]); email to S. Ganjam regarding same (.20) | .20 |
| 7/25/23 | JZ | Review article [redacted] and email to F. Cialone and S. Ganjam (.10) | .10 |
| 7/27/23 | SSG | Telephone conf. with J. Zeldin regarding next steps, [redacted] (1.0); research and analysis regarding same; email to J. Stellato regarding [redacted] (.70) | 1.70 |

Invoice #: 5479338 REDACTED August 3, 2023

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| 7/27/23 | JZ | Read and digest 9th Circuit opinion and outline possible next steps (.30); conference with S. Ganjam regarding [redacted] (.20); conference with F. Cialone regarding strategy (.10); email to S. Ganjam regarding [redacted] (.20); conference with S. Ganjam regarding [redacted] and discuss strategy, sequence and timing for [redacted] (.80) | 1.60 |

**TOTAL PROFESSIONAL SERVICES** **$ 21,013.00**

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Frank A. Cialone | 1.00 | 875.00 | 875.00 |
| Sanjeet S. Ganjam | 14.00 | 735.00 | 10,290.00 |
| Joel Zeldin | 9.80 | 960.00 | 9,408.00 |
| Chris R. Berggren | 1.10 | 400.00 | 440.00 |
| **TOTALS** | **25.90** | | **$ 21,013.00** |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

**TOTAL DISBURSEMENTS ADVANCED** [redacted]

**TOTAL THIS INVOICE** $21,013.00 [redacted]

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

November 3, 2023
Invoice # 5483222
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through October 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | | |
|---|---|---|
| Professional Services | | [redacted] |
| Total Disbursements Advanced | | [redacted] |
| **TOTAL THIS INVOICE** | $15,582.50 | $[redacted] |
| [redacted] | | [redacted] |
| **TOTAL BALANCE DUE** | $15,582.50 | [redacted] |

Invoice #: 5483222 November 3, 2023

REDACTED

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 10/06/23 | SSG | Confer with J. Zeldin regarding strategy for Reply brief to motion for fees (1.0); draft reply | 1.40 |
| 10/06/23 | JZ | Read and highlight issues from BraunHagey opposition to fee motion (.50); initial call with S. Ganjam regarding BraunHagey opposition brief and issues to research (.40); [redacted] | .90 [redacted] |
| 10/08/23 | SSG | Draft reply to fee motion and research and analysis for same | 2.80 |
| 10/09/23 | SSG | Draft reply to fee motion and research and analysis regarding same | 6.30 |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 10/10/23 | SSG | Draft reply to fee motion | 4.90 |
| 10/10/23 | JZ | Two conferences with S. Ganjam regarding Reply (.20); read and edit Reply on attorneys' fee motion (1.10); review and revise final draft of motion and email to S. Ganjam (.80) | 2.10 |
| 10/10/23 | CRB | Telephone conference with S. Ganjam regarding upcoming reply brief filing and review previous pleadings per S. Ganjam request | .20 |
| 10/11/23 | SSG | Revise and file reply brief | .50 |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 10/11/23 | JZ | Review final papers on Reply (.10); [redacted] | .10 [redacted] |
| 10/11/23 | CRB | Draft reply declaration and cite check reply brief per S. Ganjam request and communications regarding same | 2.10 |
| [redacted] | [redacted] | [redacted] | [redacted] |

REDACTED

Invoice #: 5483222 November 3, 2023

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

**TOTAL PROFESSIONAL SERVICES** $15,582.50 [redacted]

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | 15.90 [redacted] | 735.00 | $11,686.50 [redacted] |
| Joel Zeldin | 3.10 [redacted] | 960.00 | $2,976 [redacted] |
| Chris R. Berggren | 2.30 | 400.00 | 920.00 |
| **TOTALS** | 21.30 [redacted] | | [redacted] $15,582.50 |

Invoice #: 5483222 REDACTED November 3, 2023

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| | [redacted] | [redacted] |

| | | |
|---|---|---|
| **TOTAL DISBURSEMENTS ADVANCED** | | [redacted] |
| **TOTAL THIS INVOICE** | $15,582.50 | [redacted] |

SF SHARTSIS FRIESE LLP
One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598
Telephone: (415) 421-6500 •
billing@sflaw.com
Federal Tax ID: 94-2288901

**PRIVILEGED AND CONFIDENTIAL**

REDACTED

January 4, 2024
Invoice # 5485783
Billing Atty. JZ

LTC (BVI) Limited
C/o Jesse Stellato
[redacted]

---

## INVOICE SUMMARY

For professional services rendered and costs advanced through December 31, 2023:

**Client.Matter: 13085.1**

**RE: BraunHagey**

| | |
|---|---|
| Professional Services | $2,130.00 [redacted] |
| Total Disbursements Advanced | [redacted] |
| **TOTAL THIS INVOICE** | $2,130.00 [redacted] |

Invoice #: 5485783 REDACTED January 4, 2024

**Client.Matter: 13085.1**

**RE: BraunHagey**

**PROFESSIONAL SERVICES RENDERED**

| Date | Atty | Description Of Services Rendered | Hours |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 12/27/23 | SSG | Review Ninth Circuit and District Court order transferring motion for attorneys' fees to District Court (0.1); telephone conf. with J. Zeldin regarding strategy for renewing motion for attorneys' fees in district court (0.6); email with client regarding same (0.1) | .80 |
| 12/27/23 | JZ | Read 9th Circuit order remanding attorneys' fee issue to District Court and analyze implications (.1); conference with S. Ganjam regarding same (.6); email to client (.2) | .90 |
| 12/28/23 | SSG | Review rules regarding deadline to renew fee motion (0.1) | .10 |
| 12/30/23 | SSG | Review rules regarding deadline to renew fee motion (0.2) | .20 |
| 12/30/23 | JZ | Email with S. Ganjam regarding attorneys' fee motion (.1) | .10 |
| 12/31/23 | SSG | Email with J. Zeldin regarding strategy for motion for attorneys' fees | .10 |
| 12/31/23 | JZ | Email to S. Ganjam regarding strategy on attorneys' fee motion (.1) | .30 |

**TOTAL PROFESSIONAL SERVICES** $2,130.00 [redacted]

**SUMMARY OF PROFESSIONAL SERVICES**

| Name | Hours | Rate | Total |
|---|---|---|---|
| Sanjeet S. Ganjam | 1.20 [redacted] | 735.00 | $882 [redacted] |
| Joel Zeldin | [redacted] 1.30 | 960.00 | $1,248 [redacted] |

REDACTED

Invoice #: 5485783 January 4, 2024

| Name | Hours | Rate | Total |
|---|---|---|---|
| **TOTALS** | 2.50 [redacted] | | $2,130 [redacted] |

**DISBURSEMENTS ADVANCED**

| Date | Description | Amount |
|---|---|---|
| [redacted] | [redacted] | [redacted] |

| | |
|---|---|
| **TOTAL DISBURSEMENTS ADVANCED** | [redacted] |
| **TOTAL THIS INVOICE** | $2,130.00 [redacted] |